UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:04CV-631-H

PAUL WHITEWOOD                                                    PLAINTIFF

V.

ROBERT BOSCH TOOL CORP.                                DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Paul Whitewood, was an employee of Defendant, Robert Bosch Tool Corp.[1] at the time it decided to close its Louisville facility. As part of winding down its operations, Defendant offered a severance package to several hundred of its employees to encourage them to remain with the company until operations ceased. This dispute arises from a dispute between Plaintiff and Defendant about the terms of that severance offer. Plaintiff filed suit for breach of contract and for unpaid wages under KRS 337.385. Defendant has moved for summary judgment on both claims. In an effort to fully understand all of the arguments, the Court has discussed the case with counsel on several occasions.

I.

Paul Whitewood is a forty-three year-old electrical engineer. Defendant hired him as a corporate quality manager and relocated him to Louisville. He reported for work at Vermont

---

[1] The original company was Vermont American Corporation. In 1990 a joint venture of Defendant and Emerson Electric purchased Vermont American. Sometime later Defendant bought out Emerson. Thereafter, Vermont American began a transition into Defendant. Eventually Defendant centralized management of Vermont American out of Mount Prospect, Illinois.

American in July 2001. In early 2002, Defendant announced its intention to close Louisville operations by early 2004. Plaintiff contends that after the public announcement, he eventually received a written offer of a severance and retention package dated January 27, 2003. Plaintiff regarded the retention offer as a promise to pay him if he stayed through a specific time (end of Quarter 1, 2004). Plaintiff understood that he would be required to sign a release of all claims as to Defendant. Plaintiff stayed on and continued to work for Defendant. He received an amended retention offer on May 13, 2003, increasing the bonus by a flat $10,000 and also reflecting the small raise he had been given after the January 27, 2003, bonus offer. He continued to work for Bosch because he believed that if he satisfactorily completed the retention period and signed a release, he would receive the increased bonus.

Plaintiff first saw the Separation Agreement around March 15, 2004, when he was first presented with it for signing. In particular, Plaintiff had a question with the provision in the Separation Agreement that "Whitewood will not reapply for a position with RBTC or with any of its affiliated, related or subsidiary companies." He believed that the provision might prevent him from going to work for anyone else because he did not know what companies he could not apply to. He also objected because the restriction was "open forever and a day on any and every definition and any future acquisition, affiliation, or whatever the other word was, without those even defined." He explained that, if Bosch had at least provided him with a list of what companies he would not be able to apply to, he would have been able to make a proper decision on whether to go ahead and sign the Separation Agreement to resolve the impasse.

Plaintiff took his concerns to Gale Gentry in Defendant's HR department. He was not helpful. Finally, Frederick A. Stuart, Vice President Labor Relations and Employment,

responded that, "You'll either have to accept the agreement as written or proceed without the benefit of the agreement." Plaintiff felt that after doing what he had been asked to do and after complying with all of the conditions of the bonus document, Bosch was telling him, "if you don't sign something beyond what we had asked you to do, you get nothing." By March 30, 2004, Plaintiff had consulted an attorney and informed Defendant that he would not sign. Defendant immediately replied, rejecting Pearlman's effort, and advising "Mr. Whitewood chose to refuse the separation package, and we now consider the matter closed." On October 14, 2004, Plaintiff filed suit in the Jefferson Circuit Court. Defendants removed to this Court.

II.

Plaintiff's primary claim sounds in contract. He says that Defendant created this contract by its offer memorialized in writing dated January 27, 2003, which promised a specific "severance and retention bonus" if Plaintiff remained with the company through March 31, 2004. The initial question, therefore, is whether Defendant made an unambiguous severance offer. The Court concludes that Defendant did so. The initial verbal severance offer and the subsequent written communication dated January 27, are entirely consistent. The Court finds that Defendant promised to pay defined severance benefits in return for (1) Plaintiff remaining with the company until March 31, 2004 and (2) Plaintiff signing a release of all claims. Both the testimony and the January 27, 2003 letter make these conditions clear. Defendant's performance of its obligations is conditional of Plaintiff's performance under the offered terms.

Courts have differed in considering whether partial performance constitutes a binding acceptance in the context of a unilateral contract, but the Sixth Circuit has held that "an acceptance of an offer by part performance in accordance with the terms of the offer is sufficient

3

to complete the contract." *Allied Steel & Conveyors, Inc. v. Ford Motor Co.*, 277 F.2d 907, 911 (6th Cir. 1960). Despite a dearth of Kentucky case law on point, it is clear that courts are hesitant to allow an offeror to revoke an offer after partial performance in accordance with its terms. *See* 17 C.J.S. *Contracts* §63 (2006). The Court concludes that Kentucky courts would follow a similar analysis and would find a unilateral offer accepted by tendered performance. The jury must interpret the conditions of the original offer to determine whether Defendant in fact breached by altering those conditions.

   Though Plaintiff remained on the job through the requisite time, Defendant argues that he breached the original conditions by refusing to sign the tendered Separation Agreement. Plaintiff offered to sign what he would consider a standard release of all claims; but he refused to sign the tendered Separation Agreement. From Plaintiff's viewpoint, the factual issue presented is whether Defendant's tender of the Separation Agreement constituted a new condition of the original offer. If the Separation Agreement is a new condition or an additional requirement, then Defendant has revoked the terms of its original unilateral offer and Plaintiff was within his rights to refuse to sign it and is entitled to the severance benefits promised, regardless. *See* 17 C.J.S. *Contracts* §63 (2006) (discussing unilateral contracts and stating that in many situations courts have held that part performance by an offeree bars revocation of the offer until the time specified for performance). If the Separation Agreement is within the meaning of the release condition in the original offer, then Plaintiff's refusal to sign excuses Defendant's further performance. *See id.*

   Upon these issues reasonable minds could differ. On the one hand, the Separation Agreement contains many standard provisions that were not so abhorrent for hundreds of others

4

to sign. On the other hand, a permanent prohibition against applying for employment with Defendant or its subsidiaries seems quite a bit different and broader than a release of all claims. The latter proposition seems the stronger argument. Nevertheless, a jury should decide whether the requirement of assent to the Separation Agreement represents a material change to the original terms of Defendant's offer.

## III.

Plaintiff's second claim is that he is entitled to unpaid wages, double damages and attorney's fees pursuant to KRS 337.385. The Court finds that this claim fails because Plaintiff is statutorily exempt from recovering under KRS 337.385 since he was employed in a professional capacity.

KRS 337.385 creates a statutory remedy when an employer fails to pay an employee wages to which he is entitled:

> Any employer who pays an employee less than wages and overtime compensation to which such employee is entitled under or by virtue of KRS 337.020 to 337.285 shall be liable to such employee affected for the full amount of such wages and overtime compensation, less any amount actually paid to such employee by the employer, for any additional equal amount as liquidated damages, and for costs and such reasonable attorney's fees as may be allowed by the court.

Ky. Rev. Stat. Ann. § 337.385 (2006). This section is limited by KRS 337.010(2), which states:

> "As used in ... KRS 337.385..., unless the context requires otherwise: (a) 'Employee' is any person employed by or suffered or permitted to work for an employer, but shall not include:...any individual employed in a bona fide executive, administrative, supervisory, or professional capacity, or in the capacity of outside salesman, or as an outside collector as the terms are defined by administrative regulations of the commissioner."

Ky. Rev. Stat. Ann. § 337.010(2) (2006). The Kentucky Administrative regulations define professional employees as those (a) compensated on a salary not less than $455 per week, and

5

(b) primarily performing work "requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction; or requiring invention, imagination, originality, or talent in a recognized field of artistic or creative endeavor." 803 Ky. Admin. Regs. 1:070 (2006). The regulations also exempt learned professionals who perform work requiring advanced knowledge in a field of science or learning, which explicitly includes the traditional profession of engineering. *Id.* The question of whether Plaintiff is an exempt employee under KRS Chapter 337 is a legal issue for the Court to decide.

Plaintiff was a professional electrical engineer. He was initially engaged in the design and manufacture of tools and earned over $100,000 annual salary with additional bonuses. As a corporate quality manager, he worked with other manufacturing facilities to satisfy requirements on "corporate metrics for quality performances." In performing these tasks, he used his engineering skills, his analytic skills and considerable independent judgment to succeed in his work. He supervised others and made employment decisions. Although he maintained his same job title until the end, he supervised fewer employees.[2] The overwhelming weight of the evidence convinces the Court that Plaintiff used his skills and ingenuity as an engineer to perform his job and supervise others. The statute and the accompanying regulations expressly

---

[2] Despite the plain language of the statute and its interpretation by the administrative regulations, the Kentucky Court of Appeals has permitted an arguably exempt medical director to recover under KRS 387.385 because the context "required otherwise." *Healthcare of Louisville v. Kiesel*, 715 S.W.2d 246, 248 (Ky. Ct. App. 1986). The court reasoned that "it is just as unlawful to fail to pay or to withhold a part of the salary of any executive, administrative, supervisory or professional employee as it would be to do so in the case of any other type of employee." *Id.* The court in *Kiesel* gives little indication as to when or how the statutory exception would apply. The determination of whether an employee is engaged in a "professional capacity" is dependent on the actual job being performed in addition to the qualifications and educational background of the employee, so it is plausible that the court in *Kiesel* believed that the medical director's position was more akin to that of a subordinate employee than a supervisor or doctor engaged in professional activities. *Kiesel* is perhaps further distinguishable from the present case in that it involved a dispute over "salary" and bonuses, whereas this case deals only with a severance package. The Court's role in analyzing state law is to predict how Kentucky courts would rule on this particular issue. In this case, the Court is confident that the Supreme Court of Kentucky would follow the statutory text and regulatory guidance and that the *Kiesel* decision would not dictate the specific result.

exempt persons working in this kind of capacity. That Plaintiff may have ceased to supervise others in the latter part of his employment is not sufficient to overcome the other evidence and alter his status as an exempt employee. Plaintiff remained employed in a professional capacity and exercised those skills. The Court concludes that Plaintiff is an exempt person as defined in KRS 337.010(2).[3]

The Court will enter an order consistent with this Memorandum Opinion.

cc: Counsel of Record

---

[3] Since the KRS 337.010(2) exception applies to Plaintiff, the Court need not make a determination as to whether Defendant acted in good faith. If an employer can show that it acted in good faith, the Court has discretion to reduce or eliminate double damages. KRS 337.385 states that:
> ...[I]f, in any action commenced to recover such unpaid wages or liquidated damages, the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of KRS 337.020 to 337.285, the court may, in its sound discretion, award no liquidated damages, or award any amount thereof not to exceed the amount specified in this section.

Ky. Rev. Stat. Ann. § 337.385 (2006). In this case, Plaintiff likely satisfied its burden of showing good faith, but since Plaintiff is exempt from recovery under this statute, the Court need not examine the issue. Under a plain reading of the statute, attorney's fees are not affected by a showing of good faith.